# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

SHAWN BURNETT, # 277404,

        Petitioner,

v.

                                      Case Number: 08-cv-10804
                                      Honorable John Corbett O'Meara

CINDI CURTIN,

        Respondent.

_____/

## OPINION AND ORDER
## (1) DENYING PETITION FOR WRIT OF HABEAS CORPUS,
## (2) DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY,
## AND (3) DENYING LEAVE TO PROCEED ON APPEAL *IN FORMA PAUPERIS*

Petitioner Shawn Burnett, a state inmate currently confined at the Carson City Correctional Facility in Carson City, Michigan,[1] filed a *pro se* petition for writ of habeas corpus under 28 U.S.C. § 2254, alleging that he is incarcerated in violation of his constitutional rights. Petitioner and co-defendant, Montez Cooper, were convicted of numerous offenses which occurred in the Genesee County, Michigan cities of Flint and Burton, as part of a single plan. The cases were consolidated. It was determined that Petitioner and Cooper both participated in the torture, rape, kidnapping, and murder of Ray McFadden in Flint, Michigan. Subsequently, in order to avoid capture and dispose of the evidence, they fled to Burton, Michigan, armed with guns. Once there, Petitioner killed

_____

[1]Petitioner was incarcerated at the Oaks Correctional Facility when he originally filed his habeas petition; however, he has since been transferred to the Carson City Correctional Facility. The proper respondent in a habeas case is the habeas petitioner's custodian, which in the case of an incarcerated petitioner is the warden of the facility where the petitioner is incarcerated. Rule 2(a) of the Rule Governing § 2254 Cases; *see also Edwards v. Johns*, 450 F.Supp.2d 755, 757 (E.D. Mich. 2006). In most cases where a petitioner is transferred to a different facility after the petition has been filed, the Court would order an amendment of the case caption. However, because the Court is denying the petition in this case, it finds no reason to do so.

Lashell Childs, using the same gun that was used to shoot McFadden. He then shot and wounded Lakisha Johnson with the same gun.

On August 29, 2003, Petitioner was convicted of the following. In the Flint case, he was convicted of (1) first-degree murder, MICH. COMP. LAWS § 750.316 (a)(2), (2) the alternative count of first-degree felony murder, MICH. COMP. LAWS § 750.316 (b), (3) conspiracy to commit first-degree murder, MICH. COMP. LAWS § 750.316 (a), (4) first-degree criminal sexual conduct, MICH. COMP. LAWS § 750.520(b), (5) kidnapping, MICH. COMP. LAWS § 750.349, and (6) intimidation of a witness, MICH. COMP. LAWS § 750.122(7)(b). In the Burton case, he was convicted of (1) second-degree murder, MICH. COMP. LAWS § 750.317, (2) assault with intent to commit murder, MICH. COMP. LAWS § 750.83, (3) felon in possession of a firearm, MICH. COMP. LAWS § 750.224(f), and (4) felony firearm, MICH. COMP. LAWS § 750.227(b)(a). Petitioner was sentenced, as a habitual offender, second offense, to (1) life in prison for the first-degree murder convictions, (2) concurrent sentences of sixty to 100 years in prison for the second-degree murder and sexual-assault convictions, (3) fifty-six to ninety years in prison for the assault-with-intent-to-murder conviction, (4) eight to fifteen years in prison for the witness-intimidation conviction, and (5) four to five years in prison for the felon-in-possession conviction. Additionally, Petitioner was sentenced to the mandatory two-year consecutive prison term for the felony-firearm conviction. For the reasons set forth, the Court will deny the petition. The Court will also decline to issue Petitioner a certificate of appealability and will deny him leave to proceed on appeal *in forma pauperis*.

# I. BACKGROUND

Trial in this case began on July 23, 2003, and concluded on August 29, 2003. Petitioner and Cooper were tried together. The prosecution presented fifty-one witnesses and numerous exhibits. Pertinent testimony revealed the following.

Major Pyles, a neighbor, testified that, on January 18, 2003, he was awakened about 6:00 a.m., by gunshots. He said he looked out his bedroom window and saw car lights pointing toward his house. He then saw a shadow come down his driveway. A light on the side of his house went on because it detected motion. Pyles saw a young man in his driveway kneeling in front of a neighbor's car. The young man was naked. The young man then ran behind his house yelling for help. Pyles heard banging on his door and then three more shots. Pyles ran downstairs, looked out his back-door window, and saw the young man lying on his back steps. He called 911.

Denise Green, Pyles's neighbor, testified that, on the day in question, she was awakened by her dog barking. She said she heard someone yelling and screaming. She then heard two shots. According to Green's testimony, she heard someone pounding on Pyles's door, yelling for help. She heard four more shots and then silence.

Damontae Davis, who lived four houses away, heard three or four shots on the day in question. He testified that he heard the shots, heard a speeding car, heard someone screaming for help, and then heard more shots.

Officer Todd Pillsbury and his partner Todd Burch responded to the scene. They saw the body of a black male lying at the bottom of the back-door steps to Pyles's house. There was a gunshot wound to his forehead and another one in the back of his head. His chest was red and raw. There was bruising all over his body, scrape marks and gouges in his legs, and another gunshot

wound in his right leg between his ankle and his knee. They found three live .40 caliber rounds within two feet of the body. There were three empty .40 caliber shell casings and a bullet fragment nearby.

Barbara Henry, a desk clerk at Walli's Super 8 East Motel, testified that, on the day in question, at around 8:00 p.m., she was called by a woman in room 230. The woman said she had been shot and needed help. Henry called 911. The police arrived about five minutes later.

Sarah Whitman, a Burton police officer, was dispatched to the scene. When she arrived, she went to the second floor of the motel, where she saw a black female on the balcony. The woman was alive but incoherent. Officer Whitman, along with another officer, Marty Coe, and a paramedic from the Sheriff's Department, Lieutenant Bouchard, went into room 230. There was another female on the floor between the two beds. Lieutenant Bouchard determined that the woman in the room was dead. There was a large amount of blood around both victims.

Royal Kamien had known Petitioner, Germaine Burnett, Greg Calhoun, Corey Wilson, and Montez Cooper before the incident in question occurred. Germaine was Petitioner's uncle. Kamien met Jonnard Nelson, who called himself "Capone" on the night in question. Kamien entered into a plea agreement which provided he would not be charged as a habitual offender and would be charged only with accessory after the fact to assault with intent to do great bodily harm less than murder. He agreed to give "truthful testimony." Trial Tr. vol. III, 252-53, July 25, 2003.

Kamien testified that Petitioner invited him over to his house, along with Germaine Burnett and Calhoun. They snorted cocaine. Kamien said Wilson, Cooper, and Nelson were also at the house. He said they all had guns; Petitioner and Cooper had .40 calibers, Calhoun had a nine millimeter, and Nelson had a semi-automatic pistol. Kamien said Petitioner also had an AK-47.

4

According to Kamien's testimony, Petitioner, Cooper, and Wilson were talking about someone stealing guns from the house. He testified that Petitioner said the person had been coming to the house all week, getting high for free and that "he wanted to whip his ass." Trial Tr. Vol. III, 267, July 25, 2003. Cooper said he wanted to ask that person some questions. Kamien said Petitioner then made a phone call and McFadden arrived about thirty to forty-five minutes later.

Kamien further testified that Petitioner then whispered something to Cooper. Cooper put gloves on his hands and starting punching McFadden. He threw him on the couch. Petitioner told McFadden to remove his clothes and kicked him in the face. Petitioner told Cooper to hit McFadden with an aluminum bat because he was not taking his clothes off fast enough. Cooper hit McFadden several times with the bat, in the head and on his arms. Cooper also poked McFadden with a knife. Petitioner kept asking McFadden where his guns were, but McFadden denied taking the guns. Petitioner then hit him in the face again.

Petitioner, Cooper, and the others, including Kamien, continued to torture McFadden. During that time, they were all ingesting powder cocaine and then later crack cocaine.

After McFadden had removed his clothes, Petitioner told him "to get in a dog[-]style position." Trial Tr. vol. IV, 66, July 29, 2003. Petitioner then squeezed some liquid soap on McFadden's buttocks and put a broom handle into his rectum, moving it back and forth. Nelson did the same. Cooper then put a lit cigarette into McFadden's mouth and told him to eat it. Cooper also threw some bleach on his face and chest.

Shortly after, there was a knock on the door. Four girls, who appeared to be drunk, were at the door. Petitioner told McFadden to get in the closet. The girls stayed for one hour and then left.

After the girls left, Petitioner opened the closet door and told McFadden to get dressed. He then whispered something to Cooper. Petitioner then put a gun to McFadden's side and walked him out to the car. The others followed and also got into the car.

Approximately forty-five minutes later, they returned to the house. Nelson and McFadden did not return with them. Petitioner told Kamien that he wanted him and Calhoun to look for Nelson. He told him where the car was parked, a block from the house. Kamien drove the car and Calhoun directed him. When they saw police cars with sirens, Calhoun directed Kamien to drop him off, which Kamien did. Kamien then took the car back to where it was parked and went back to Petitioner's house.

Once inside the house, Petitioner told Kamien that they needed to clean up. He cut the carpet with a knife and placed items from the closet into garbage bags. The carpet was pulled up because there was blood on it. Kamien was then instructed to get a hotel room for them, which he did.

When they arrived at the hotel, Petitioner told Kamien to clean out the car, which he did. He then joined the others at the hotel. After a while, Petitioner and Wilson left, and then Cooper and Nelson left. Cooper and Nelson returned and Cooper made a phone call. They left again and returned with two young women. Petitioner and Wilson returned shortly after.

Petitioner then said he wanted someone to rub his back. One of the young women went into the bathroom with him; he had a pistol and a towel in his hands. Kamien testified that the young woman then came out of the bathroom shaking. Petitioner came out after her.

According to Kamien's testimony, when Petitioner asked Kamien to get something out of the car, instead, he just got into the car and left, because he did not feel comfortable with what was

happening. He then saw the news on television and realized that the events talked about related to what he knew so, he arranged to turn himself in to the police.

Calhoun also entered into a plea agreement; he pleaded guilty to kidnapping and agreed to testify truthfully against Petitioner.

Calhoun testified that he was with Petitioner and the others on the night in question, smoking marijuana and sniffing cocaine. He acknowledged that McFadden came to the house. He said Petitioner threatened to shoot McFadden.

According to Calhoun's testimony, when McFadden came out of the closet, Petitioner told him to get dressed and that he would take him home. They all then left the house. Nelson was driving.

Again, Petitioner asked McFadden about the guns and again McFadden denied that he had taken the guns. Petitioner then told Calhoun to remove McFadden's clothes. Petitioner told McFadden that he was going to make him walk home. He then told Nelson to stop the car. McFadden got out of the car. Petitioner then told Nelson to "handle that." Trial Tr. vol. VI, 68, July 31, 2003. Nelson grabbed the gun from Calhoun and got out of the car.

Calhoun heard a gunshot. Nelson returned to the car and said "Man, it won't shoot." Trial Tr. vol. VI, 69, July 31, 2003. Petitioner then got out of the car and jumped over a fence into a backyard. He shot the gun three times and then got back into the car. He drove the car around until he found Nelson. Nelson got into the car and then got out and said, "[M]an, leave me, man, leave me." Trial Tr. vol. VI, 84, July 31, 2003. Petitioner told Nelson to be sure to return to the house.

According to Calhoun's testimony, when they returned to the house, Petitioner told Kamien to take him and go look for Nelson. They left. As they were driving around, he told Kamien to drop

him off at a house that was near his mother's house because he did not want Kamien to know where his mother lived. Calhoun testified that he was feeling paranoid because of the cocaine.

Lakisha Johnson testified that she was at her mother's house on the night in question with her friend Lashell Childs. Two men came to the house to pick them up but left after getting into an argument with her uncle. Ms. Johnson then got into an argument with her mother. She and Childs left the house. She took two bags with her, which contained clothes.

After they left the house, Childs made a phone call. Two men picked them up; one of the men was Cooper. The men were supposed to take them to Childs's house but instead took them to a Super 8 motel in Burton, Michigan.

According to Johnson's testimony, there were seven men at the motel, all had guns and were using cocaine. The men gave Johnson and Childs some marijuana, which they used. Childs then asked to use Johnson's cell phone. She gave her cell phone to Childs and Childs went into the bathroom and called her uncle. When she came out, Petitioner took the cell phone from her.

Johnson further testified that Petitioner then wanted to take a bath and asked her to take one with him. She refused. He then asked her to take her clothes off. She agreed because he had a gun. Petitioner then assaulted Johnson in the bathtub.

When Johnson came out of the bathroom, only she, Childs, and Petitioner were in the room. The other men left. Petitioner then shot Childs in the head. As he came toward Johnson, she put her leg up to block the shot that was aimed at her head. Petitioner then ran out of the room. Johnson called the motel desk clerk.

Johnson had four gunshot wounds. She had several surgeries, including a colostomy, which was eventually reversed.

Dr. Terry Krznarich performed the autopsy on McFadden. There were two gunshot wounds to the head, one to the forehead, and one behind the left ear. There was stippling on the left shoulder, which indicated a close-range shooting. The skin on the chest and around the hip appeared burned. The burns were consistent with boiling water or bleach. There was swelling around both eyes. There was hemorrhaging under the skin on the forehead, consistent with blunt-force trauma such as a baseball bat. There was swelling and broken bones on the right hand, consistent with a defensive wound. There were more blunt-force injuries on the left hip. There were tears in the skin at the anal opening, consistent with an object forced against the anal opening. There was a puncture wound in the back of the right hip, which was consistent with a knife wound. Dr. Krznarich believed there was a minimum of twenty-one blunt-force wounds. He testified that the immediate cause of death was the gunshot wounds to the head.

Dr. Krznarich also performed the autopsy on Childs. There was a gunshot wound to her head. He testified that the immediate cause of death for Childs was the gunshot wound to her head.

Petitioner did not testify. The jury found him guilty as charged.

Following his sentencing, Petitioner filed a direct appeal with the Michigan Court of Appeals, raising the following claims: (1) the trial court erred in joining, for trial, the murder cases, (2) the identification procedure in his case was tainted, (3) the admission of the statement of a non-testifying co-defendant was in error, (4) the admission of Calhoun's prior inconsistent statements was in error, and (5) the prosecutor committed misconduct by improperly vouching for the testimony of a witness and eliciting testimony from the detective that Petitioner had exercised his right to remain silent.

The Court of Appeals affirmed Petitioner's convictions. *People v. Burnett*, Nos. 251356, 251357,

2005 WL 839474 (Mich.Ct.App. Apr. 12, 2005).

Petitioner neither filed an application for leave to appeal the Court of Appeals's decision with the Michigan Supreme Court nor a writ of certiorari with the United States Supreme Court. Rather, on March 21, 2006, he filed a motion for relief from judgment with the trial court, raising the same claims raised in the Court of Appeals and adding the following three claims: (1) ineffective assistance of counsel, (2) ineffective assistance of appellate counsel, and (3) cumulative error. The trial court denied his motion on September 20, 2006. *People v. Burnett*, No. 03-FC-11468 (Genesee County Circuit Court, Sept. 20, 2006).

Petitioner then filed a delayed application for leave to appeal the state court's decision with the Court of Appeals. The Court of Appeals denied his delayed application for failure to meet the burden of establishing entitlement to relief under Mich.Ct.R. 6.508(D). *People v. Burnett*, No. 274692 (Mich.Ct.App. June 18, 2007). On December 28, 2007, the Michigan Supreme Court subsequently denied leave to appeal the Court of Appeals's order "because defendant has failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Burnett*, 480 Mich. 1003, 742 N.W.2d 377 (2007).

On February 27, 2008, Petitioner filed this habeas petition, raising the same claims raised in the Court of Appeals and the state trial court and the appellate courts thereafter.

## II. STANDARD OF REVIEW

28 USC § 2254(d) imposes the following standard of review that a federal court must utilize when reviewing applications for a writ of habeas corpus:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

10

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Federal courts are therefore bound by a state court's adjudication of a petitioner's claims unless the state court's decision was contrary to or involved an unreasonable application of clearly established federal law. *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998). This Court must presume the correctness of a state court's factual determinations. 28 U.S.C. § 2254(e)(1).

The United States Supreme Court has explained the proper application of the "contrary to" clause as follows:

A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases.

A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [the Court's] precedent.

*Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

With respect to the "unreasonable application" clause of § 2254(d)(1), the United States Supreme Court held that a federal court should analyze a claim for habeas corpus relief under the "unreasonable application" clause when "a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case." *Id.* at 409. The Court defined "unreasonable application" as follows:

> [A] federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable.

> [A]n unreasonable application of federal law is different from an incorrect application of federal law . . . . Under § 2254(d) (1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Id.* at 409-11.

With that in mind, the Court proceeds to address Petitioner's claims.

## III. DISCUSSION

### A. Petitioner's Claims Are Procedurally Defaulted

Petitioner's following claims are barred from habeas review by his state court procedural default: (1) the trial court erred in joining, for trial, the murder cases, (2) the identification procedure was tainted, (3) the admission of the statement of a non-testifying co-defendant was in error, (4) the admission of Calhoun's prior inconsistent statements was in error, and (5) the prosecutor committed misconduct by improperly vouching for the testimony of a witness and eliciting testimony from the detective that Petitioner had exercised his right to remain silent. Petitioner presented these claims on direct review to the Michigan Court of Appeals, but failed to timely seek discretionary review with the Michigan Supreme Court. Thus, the Michigan Supreme Court denied his application for leave to appeal as untimely. By failing to seek timely discretionary review of these claims in the Michigan Supreme Court, Petitioner has procedurally defaulted the claims.

A habeas petitioner procedurally defaults a claim if he fails to raise it in an application for discretionary review with the state's highest court. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999). A claim raised in the state court of appeals but not in the state supreme court cannot be

considered in federal habeas review. *See Harris v. Stegall*, 157 F.Supp.2d 743, 750 (E.D. Mich. 2001).

Under Michigan Court Rule 7.302(C)(3), Petitioner had fifty-six days to file an application for leave to appeal with the Michigan Supreme Court. *Rice v. Trippett*, 63 F.Supp.2d 784, 787 (E.D. Mich. 1999). Petitioner's convictions were affirmed by the Michigan Court of Appeals on April 12, 2005. Accordingly, Petitioner had until June 7, 2005, to timely file an application for leave to appeal with the Michigan Supreme Court. Petitioner failed to file a timely application for leave to appeal with the Michigan Supreme Court. Therefore, Petitioner has procedurally defaulted the above-noted claims. *See Bell v. Smith*, 114 F.Supp.2d 633, 637 (E.D. Mich. 2000). In short, Petitioner has not exhausted his state-court remedies for the issues raised above.

The exhaustion doctrine requires a petitioner to present his claims to the state courts before raising them in a federal habeas corpus petition. To fulfill the exhaustion requirement in Michigan, claims must be presented to both the Michigan Court of Appeals and the Michigan Supreme Court to complete a full round of state-appellate review before presenting them in a federal habeas corpus petition. *Dombkowski v. Johnson*, 488 F.2d 68, 70 (6th Cir. 1973).

Failure to exhaust state-court remedies, however, bars federal habeas review only when the state still provides a remedy to exhaust. *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994). Petitioner no longer has an available state remedy to exhaust his claims because he missed the deadline for appealing the Court of Appeals's decision to the Michigan Supreme Court. Mich.Ct.R. 7.302(C)(3). Further, Petitioner cannot restart the appellate process by filing a second post-conviction motion because the Michigan Court Rules prohibit filing second or successive motions for relief from judgment unless Petitioner were to demonstrate a retroactive change in the law or present to the

courts newly-discovered evidence. Mich.Ct.R. 6.502(G)(1) and (2). Because Petitioner cannot pursue a second motion for relief from judgment or other state post-conviction remedy, these claims are deemed exhausted. *Gray v. Netherland*, 518 U.S. 152, 161 (1996). However, Petitioner's claims remain barred from habeas review by his state court procedural default in failing to raise them with the Michigan Supreme Court.

Nonetheless, this Court may review Petitioner's procedurally defaulted claims on the merits only if he can establish cause for not raising his claims at all levels of state-court review, and prejudice, or that he is actually innocent of the crimes for which he was convicted. *Coleman v. Thompson*, 501 U.S. 722, 750-751 (1991); *Murray v. Carrier*, 477 U.S. 478, 496 (1986). To establish "cause," a petitioner must show that "some objective factor external to the defense impeded [his] efforts to comply with the State's procedural rule." *Murray*, 477 U.S. at 488. Objective impediments may include an unavailable claim, some interference by officials, and ineffective assistance of counsel. *Id.*

In his seventh habeas claim, Petitioner claims that his attorney was ineffective for failing to request suppression of the identification made by Lakisha Johnson, and for not calling an identification expert. In his eighth habeas claim, Petitioner claims ineffective assistance of appellate counsel for failing to raise his first six issues to the Michigan Supreme Court. And, in his ninth habeas claim, Petitioner alleges cumulative error. These claims, however, were not raised in Petitioner's direct appeal to the Michigan Court of Appeals and the Michigan Supreme Court. Rather, they were raised for the first time in his motion for relief from judgment. Following the denial of his post-conviction motion by the state-trial court, the Court of Appeals and the Supreme Court, the last state courts rendering judgment on all of the claims, both denied relief on the grounds

that Petitioner had failed to demonstrate entitlement to relief under Mich.Ct.R. 6.508(D).

Federal habeas review is barred where a state court declined to address a prisoner's federal claims because the prisoner failed to meet state procedural requirements. In such cases, the state-court judgment rests on independent and adequate state procedural grounds. *Wainwright v. Sykes*, 433 U.S. 72 (1977). When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas-corpus review. *Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991).

Recently in *Guilmette v. Howes*, 624 F.3d 286 (6th Cir. 2010), the Sixth Circuit held:

> Brief orders citing Michigan Court Rule 6.508(D) are not explained orders invoking a procedural bar. We reach this result because holdings from the Michigan courts indicate that the language used by such summary orders can refer to the petitioner's failure to establish entitlement to relief either on the merits or procedurally, and such ambiguity demands a determination that the orders are not explained. A habeas petitioner procedurally defaults a claim if:
>
>> (1) the petitioner fails to comply with a state procedural rule; (2) the state courts enforce the rule; (3) the state procedural rule is an adequate and independent state ground for denying review of a federal constitutional claim; and (4) the petitioner cannot show cause and prejudice excusing the default.

*Tolliver v. Sheets*, 594 F.3d 900, 928 n. 11 (6th Cir. 2010) (citing *Maupin v. Smith*, 785 F.3d 135, 138 (6th Cir. 1986)). The second part of this rule requires federal courts to determine the basis on which state courts rejected a given claim, and this court has struggled with this interpretive task in the context of Michigan court orders citing Rule 6.508(D). *See*, e.g., *Alexander v. Smith*, 311 F.App'x 875, 882 (6th Cir. 2009) (discussing how an "apparent conflict within this circuit's precedent" has "[c]omplicat[ed] matters" with respect to this question).

Rule 6.508(D) states in pertinent part:

Entitlement to Relief. The defendant has the burden of establishing entitlement to the relief requested. The court may not grant relief to the defendant if the motion

> (1) seeks relief from a judgment of conviction and sentence that still is subject to challenge on [direct] appeal . . . ;

(2) alleges grounds for relief which were decided against the defendant in a prior appeal or proceeding under this subchapter, unless the defendant establishes that a retroactive change in the law has undermined the prior decision;

(3) alleges grounds for relief, other than jurisdictional defects, which could have been raised on appeal from the conviction and sentence or in a prior motion under this subchapter, unless the defendant demonstrates

    (a) good cause . . ., and

    (b) actual prejudice . . . .

. . .

The court may waive the "good cause" requirement of subrule (D)(3)(a) if it concludes that there is a significant possibility that the defendant is innocent of the crime.

*Guilmette*, 624 F.3d at 289-90.

In other words, if a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either: (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice. *House v. Bell*, 547 U.S. 518, 536 (2006); *Hicks v. Straub*, 377 F.3d 538, 551-52 (6th Cir. 2004). The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence. *House*, 547 U.S. at 536. A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable

doubt. *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

To determine whether Petitioner has been denied relief based on a procedural default, the Court looks to the last "reasoned judgment rejecting the [federal] claim." *Ylst*, 501 U.S. at 803; *Guilmette*, 624 F.3d at 291-92 (citing *Ylst*, 501 U.S. at 803). The doctrine is applicable if "the last state court to review [the prisoner's] conviction 'clearly and expressly' relied on [the prisoner's] procedural default in its decision affirming the petitioner's conviction." *Rust v. Zent*, 17 F.3d 155, 161 (6th Cir. 1994) (citing *Harris v. Reed*, 489 U.S. 255, 262-63 (1989)).

The trial court analyzed Petitioner's ineffective-assistance-of-counsel claim under *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail on this claim, Petitioner must show both that (1) counsel was deficient and (2) counsel's deficiency prejudiced his defense. *Id.* at 687. "To establish deficient performance, Petitioner must demonstrate that counsel's representation 'fell below an objective standard of reasonableness.'" *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at 688). Counsel is deficient when he or she performs outside the bounds of "prevailing professional norms." *Strickland*, 466 U.S. at 688. There exists a strong presumption that counsel's performance was reasonable. *Id.* at 689.

Even where counsel's performance is deficient, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

A look at the claims that Petitioner contends should have been raised reveals that they are without merit, as the trial court aptly determined.

The trial court concluded that Petitioner's trial counsel was ineffective. Because the Court of Appeals held that the identification made by Johnson was properly admitted, trial counsel was not ineffective for failing to request suppression of the identification. The trial court also found that trial counsel was not ineffective for not calling an expert witness on identification testimony, because "[d]ecisions regarding what evidence to present and whether to call or question witnesses are presumed to be matters of trial strategy." *Burnett*, No. 03-FC-11468, at *2.

Regarding his ineffective-assistance-of-appellate-counsel claim, Petitioner argues that he informed appellate counsel of his inability to navigate the intricate appellate system and that he could not properly file his *pro per* application for leave to appeal in the Supreme Court. In this case, the record reveals that various issues were raised in Petitioner's direct appeal. The Court finds that Petitioner has failed to demonstrate that the issues that were allegedly ignored by appellate counsel on direct appeal were clearly stronger than those that were presented and he has failed to overcome the strong presumption that his appellate counsel was competent. That was also the determination by the trial court that denied Petitioner's motion for relief from judgment.

Petitioner contends that appellate counsel told him he would assist in the application, however, failed to honor his agreement. Petitioner, however, had no constitutional right to counsel on his discretionary appeal to the Michigan Supreme Court. *See Wainwright v. Torna*, 455 U.S. 586, 587-588 (1982) (relying on *Ross v. Moffitt*, 417 U.S. 600 (1974)). Consequently, Petitioner can not claim that his appellate counsel's failure to file a timely discretionary appeal denied him of his right to effective assistance of counsel and was, therefore, cause for his procedural default. Furthermore, the trial court addressed this issue and concluded that "[t]here is no record that reversible error exists in the appellate record. *Burnett*, No. 03-FC-11468, at *3.

Regarding Petitioner's cumulative-error claim, the trial court also found that "[t]here is no evidence to support the conclusion that small errors were made by [the trial court]; therefore, this claim fails." *Burnett*, No. 03-FC-11468, at *3. The trial court was correct in its assessment of this claim because "[t]he Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief," *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir.2002), *opinion corrected on denial of reh'g*, 307 F.3d 459 (2002), *and cert. denied*, 538 U.S. 947 (2003).

This Court need not address the issue of prejudice when Petitioner fails to establish cause to excuse a procedural default. *Smith v. Murray*, 477 U.S. 527, 533 (1986); *Long v. McKeen*, 722 F.2d 286, 289 (6th Cir. 1983).

Finally, Petitioner has not established that the procedural default of his claims will result in a fundamental miscarriage of justice. To establish a fundamental miscarriage of justice, a petitioner must show that some constitutional violation resulted in the conviction of someone who is actually innocent. *Schlup*, 513 U.S. at 326-327. Actual innocence means factual innocence, not mere legal insufficiency. *Bousley v. United States*, 523 U.S. 614, 624 (1998). Petitioner has made no such showing.

### B. Certificate of Appealability

"[A] prisoner seeking postconviction relief under 28 U.S.C. § 2254 has no automatic right to appeal a district court's denial or dismissal of the petition. Instead, [the] petitioner must first seek and obtain a [certificate of appealability.]" *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). A certificate of appealability may issue "only if the applicant has made a substantial showing of the

denial of a constitutional right." 28 U .S.C. § 2253(c)(2).

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong . . . . When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a [certificate of appealability] should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The Court concludes that reasonable jurists would not find its procedural assessment of Petitioner's claims debatable or wrong. The Court therefore declines to issue Petitioner a certificate of appealability and denies him leave to proceed on appeal *in forma pauperis*.

## IV. CONCLUSION

Accordingly, **IT IS ORDERED** that the "Petition for Writ of Habeas Corpus" [dkt. # 1] is **DENIED**.

**IT IS FURTHER ORDERED** that the Court declines to issue Petitioner a certificate of appealability and denies him leave to proceed on appeal *in forma pauperis* because any appeal would be frivolous. *See* Fed.R.App.P. 24(a).

s/John Corbett O'Meara
United States District Judge

Date:  December 29, 2010

I hereby certify that a copy of the foregoing document was served upon counsel of record on this date, December 29, 2010, using the ECF system, and upon Petitioner at Carson City Correctional Facility, 10274 Boyer Road, P.O. Box 5000, Carson City, MI 48811 by first-class U.S. mail.

s/William Barkholz
Case Manager
